**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| EXTREME NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07 C 0229 C |
| | ) | |
| ENTERASYS NETWORKS, INC., | ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | |

**EXTREME NETWORKS, INC.'S REPLY IN**
**SUPPORT OF ITS MOTION TO AMEND PLEADING**

Plaintiff Extreme Networks, Inc. ("Extreme Networks") submits this reply memorandum in support of its Motion to Amend, filed on December 6, 2007, and respectfully requests the Court to enter an order allowing Extreme Networks' proposed affirmative defenses and counterclaims.

**I.     INTRODUCTION**

Enterasys fails to articulate a rational basis for denying Extreme Networks' Motion to Amend.  Unlike Enterasys, which asserted boilerplate counterclaims of noninfringement and invalidity of the asserted Extreme Networks' patents in knee-jerk fashion, Extreme Networks takes seriously Judge Crocker's admonishment to avoid asserting boilerplate counterclaims until they are factually sustainable.  (*See* July 14, 2006 Order in *Garmin, Ltd. v. TomTom, Inc*., Case No. 06-C-062-C, attached as Exhibit A to the Declaration of Keith M. Stolte accompanying this Reply.)  Accordingly, Extreme Networks filed its proposed invalidity, unenforceability and equitable estoppel counterclaims only after it obtained sufficient facts to support them.

While claiming that Extreme Networks' Motion to Amend is untimely, Enterasys ignores that very little discovery and virtually no documents were exchanged prior to the Court's July 2,

2007 deadline for amending the pleadings. Indeed, Extreme Networks' initial Reply to Enterasys' counterclaims was due just one week before the scheduled deadline for amending the pleadings.

More significant, Enterasys also conceals that its own improper conduct during discovery has seriously frustrated Extreme Networks' development of facts in support of its proposed counterclaims. For example, Enterasys concealed documents and information relating to the ATX Lan Switch, a prior art switch with remote port mirroring functionality sold by Enterasys' immediate predecessor, Cabletron, prior to the '042 patent invention date. The ATX Lan Switch, together with printed materials relating to the switch, disclose each and every claim element of the '042 patent claims, and were clearly responsive to Extreme Networks' discovery requests seeking prior art. Counsel for Extreme Networks independently learned of the ATX Lan Switch during a prior art investigation in mid-November. Immediately after its discovery, Extreme Networks notified Enterasys about the ATX switch and requested production of information and documents relating to the switch. Enterasys first conceded that ATX documents were "inadvertently" not produced and promised to produce such documents forthwith. Then, instead of producing the concealed ATX documents, on December 3, Enterasys suggested that it might withdraw its infringement claims of the '042 patent. To date, however, Enterasys has neither filed a motion to dismiss its '042 patent infringement claims nor produced the withheld ATX documents.

Furthermore, despite Extreme Networks' specific document requests, Enterasys never produced U.S. Patent No. 5,309,437. Enterasys owns this patent, which is highly material prior art to the '727 patent because it discloses a "brouter" device that routes certain data packets conforming to certain protocols and bridges other packets conforming to other protocols.

Counsel for Extreme Networks learned of the '437 patent for the first time while conducting a prior art search in October 2007,[1] and therefore, Extreme Networks could not have asserted invalidity of the '727 patent or inequitable conduct based on the '437 patent prior to July 2, 2007.

Additionally, Enterasys admits that it delayed producing until at least October 9, 2007 the Request for Comments No. 1195 ("RFC 1195") upon which Extreme Networks relies in support of its proposed equitable estoppel claims.  Enterasys further impeded Extreme Networks' discovery efforts by refusing to produce its Rule 30(b)(6) witnesses until the last week of November in response to Extreme Networks' deposition notice served on October 19.  Moreover, Enterasys steadfastly refused to produce a witness who could testify about prior art to the '181, '727 and '042 patents, thus frustrating Extreme Networks' discovery efforts even further.  Enterasys should not be permitted to use its failures to comply with discovery and the Federal Rules to avoid legitimate counterclaims of invalidity, inequitable conduct and equitable estoppel.

## II.   THE '042 PATENT COUNTERCLAIMS ARE NOT FUTILE

### A.   To Date, Enterasys has not Dismissed Its Infringement Claims against Extreme Networks for U.S. Patent No. 6,041,042.

In mid-November, counsel for Extreme Networks learned of the ATX Lan Switch which offered remote port mirroring functionality and featured each and every element of the asserted

---

[1] As discussed in greater detail below, Enterasys' claim that Extreme Networks already knew about the '437 in the Massachusetts litigation is not an excuse for its failure to produce the '437 patent in this case. The Massachusetts litigation is not an extension of this litigation, as Enterasys continuously presumes, and the McDermott Will & Emery *Chicago Office* team of lawyers responsible for pretrial matters in this litigation (i) is not the same as the McDermott Will & Emery *Palo Alto Office* team responsible for the Massachusetts litigation, (ii) is not involved with the patents, issues and discovery efforts in the Massachusetts litigation and (iii) was not involved in the exchange of hundreds of thousands of documents in the Massachusetts litigation.  Enterasys cannot use the unrelated Massachusetts litigation as an excuse for not fully complying with its discovery obligations and the Federal Rules in this case.

claims of the '042 patent.  (Stolte Decl. ¶ 29.)  By letter dated November 21, 2007, Extreme

Networks notified Enterasys about the prior art ATX switch sold by Enterasys' predecessor,

Cabletron, prior to the invention date of the '042 patent.  (*See* Stolte Decl. ¶ 29.)  In that letter,

Extreme Networks pointed out that documents relating to the ATX switch were responsive to

various Extreme Networks' document requests, and requested that they be produced.  In

response, Enterasys stated that "a review of Enterasys' document productions has found that a

few documents relevant to remote port mirroring, which also includes a handful of ATX switch

documents, were inadvertently not produced."  (*See* Stolte Decl. ¶ 30.)  Enterasys also undertook

to "produce the documents as soon as possible."  (*Id.*)  Counsel for Enterasys also claimed to

have obtained additional documents from their client which counsel pledged would also be

produced as soon as possible.  (*Id.*)  Enterasys never produced the ATX documents it promised

to produce.  (*Id.*)

Instead, recognizing that the validity and enforceability of the '042 patent is in serious

doubt based on the prior art ATX Lan Switch, on or about December 3, counsel for Enterasys

telephonically advised Extreme Networks that Enterasys now intended to withdraw its claims of

infringement of the '042 patent.  (Stolte Decl. ¶ 31.)  On December 5, the parties had another

conference call to discuss the matter.  After pointing out that Enterasys needlessly forced

Extreme Networks to expend significant resources defending against the '042 patent, Extreme

Networks stated that it would stipulate to the dismissal of the '042 patent infringement claims

with prejudice, conditioned upon at least a royalty-free license or covenant not to sue for

infringement of the '042 patent by any past, current or future products that Extreme Networks

sold or would sell in the future.  (*Id.*)  Although Enterasys' counsel indicated they would consult

with Enterasys about the proposed terms for a stipulated dismissal and respond to Extreme

Networks, counsel never did, even after a follow up by Extreme Networks on December 16. (*Id.*)

The afternoon before its response to Extreme Networks' Motion to Amend was due, Enterasys sent its December 19 letter purportedly promising not to sue Extreme Networks based on the '042 patent as a clear, last ditch attempt to preempt Extreme Networks' proposed counterclaims for non-infringement, invalidity and unenforceability of the '042 patent. (*See* Stolte Decl. ¶ 32.) Yet, Enterasys has, to date, not filed a motion to dismiss its '042 patent infringement claims. While Extreme Networks has made a good faith offer not to assert its counterclaims provided that Enterasys dismiss its infringement claims *with prejudice* and covenant not to sue Extreme Networks (or its successors or assigns or customers) for any past, current or future products, Enterasys still has not responded on these requested terms and instead seeks to pull the jurisdictional rug out from under Extreme Networks' proposed counterclaims.

**B.    An Attorney's Promise that a Client Will Not Sue Does Not Divest the District Court of Jurisdiction Over a Counterclaim in View of the <u>Supreme Court's Holding in *MedImmune, Inc. v. Genentech, Inc.*</u>**

Enterasys seeks to avoid Extreme Networks' counterclaims of invalidity and unenforceability of the '042 patent based on its December 19 letter purportedly covenanting not to sue Extreme Networks under the '042 patent, "as it currently reads," for products or methods that Extreme Networks currently offers. However, Enterasys' '042 patent infringement claims are still pending, notwithstanding Mr. Sullivan's letter, and Enterasys has not filed a motion to dismiss those claims under Fed. R. Civ. P. Rule 41(a)(2). Citing to *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059-60 (Fed. Cir. 1995), Enterasys argues that an attorney's mere statement promising that the client would not sue the opposing party for infringement as to any claim of the patent-in-suit serves to divest a district court of jurisdiction over a counterclaim seeking a declaration of the patent's invalidity and/or unenforceability.

As the Federal Circuit has recognized in its recent decisions, the jurisdictional test applied in *Super Sack* was rejected earlier this year by the Supreme Court in *MedImmune, Inc. v. Genentech, Inc.*, 127 S.Ct. 764, 774 n.11 (2007).  *See*, *e.g.*, *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1339 (Fed. Cir. 2007) (noting that "because the Supreme Court in *MedImmune* cautioned that our declaratory judgment 'reasonable-apprehension-of-suit' test contradict[s] and conflicts with its precedent, these Federal Circuit tests have been 'overruled by . . . an intervening Supreme Court decision'"); *SunDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380 (Fed. Cir. 2007) ("The Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test.").

In particular, while the court in *Super Sack* found that the counterclaiming party lacked a "reasonable apprehension" that it would "face an infringement suit" in light of the opposing party's promise not to bring such a suit, *Super Sack*, 57 F.3d at 1058-59, the Supreme Court held in *MedImmune* that this "reasonable apprehension of suit" test was contrary to, or in tension with, a number of the Court's prior precedents.  *See MedImmune*, 127 S.Ct. at 774, n.11.  Thus, there is little question that the holding of *Super Sack* is no longer viable in the wake of *MedImmune* and the Federal Circuit's open acknowledgement that the test applied in *Super Sack* has now been overruled by the Supreme Court.

Even if its holding somehow remains viable, *Super Sack* is distinguishable from the instant case.  In *Super Sack*, the plaintiff did not merely issue a letter purportedly promising not to sue, but also filed a motion to dismiss its patent infringement claims, a predicate action that

Enterasys has refused to do here.  Thus, Enterasys' still-pending infringement claims based on the '042 patent are inconsistent with its limited and conditional pledge not to sue.[2]

C.  **The Court has Jurisdiction over Extreme Networks' Counterclaims because an Existing Case or Controversy Still Exists due to Enterasys' Failure to Dismiss Its Infringement Claims against Extreme Networks for U.S. Patent 6,041,042.**

Under *MedImmune*, the test for determining whether the Court has jurisdiction in a declaratory judgment action is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." 27 S.Ct. at 771.  That test is satisfied here.  Enterasys has asserted claims for infringement of the '042 patent, and still asserts those same claims since it has not sought to dismiss them.  That is a *per se* basis for declaratory judgment jurisdiction.  "If . . . a party has actually been charged with infringement of the patent, there is, necessarily, a case or controversy adequate to support [declaratory judgment] jurisdiction."  *Cardinal Chem. Co. v. Morton Int'l, Inc*., 508 U.S. 83, 96 (1993).

Enterasys' qualifications on its purported covenant not to sue, i.e., carving out possible liability for future Extreme Networks products, failing to covenant not to sue successors, assigns or Extreme Networks' customers and implicitly suggesting that the covenant could not be applied to any re-issued claims of the '042 patent preserves the very real potential for future litigation between the parties.  As a result, the Court should reject Enterasys' "bursting bubble"

---

[2] While Enterasys claims that its covenant not to sue is unconditional, it in fact qualifies the pledge not to sue on the claims of the '042 patent, "*as it currently reads*," strongly suggesting that Enterasys intends to seek reissue of the '042 patent with broader claims, after which it can assert the broader claims against any Extreme Networks products and/or methods, including the ones accused in this lawsuit.  Moreover, Enterasys carves out from its purported promise not to sue any future products (or future versions of its current products) that Extreme Networks may launch in the future.  Because the purported covenant not to sue is personal to Extreme Networks, it does not cover any successor or assign of Extreme Networks or any of Extreme Networks' present or future customers.  In view of its preservation of broad rights to sue, Enterasys' so-called "unconditional" covenant is anything but unconditional.

theory of subject matter jurisdiction for several reasons.  First, Enterasys' unilateral and qualified declaration of intent not to sue is unsupported by any consideration, potentially leaving Enterasys free to attempt to withdraw, amend or alter it at any time.  Second, according to Supreme Court precedent, a judgment of non-infringement does not invariably moot a counterclaim of invalidity. *See Cardinal Chem.,* 508 U.S. at 98; *Altvater v. Freeman*, 319 U.S. 359, 363-64 (1943).  In view of these holdings, it seems implausible that a party's unilateral withdrawal of an infringement claim, which Enterasys has not even made, should have this effect.  In fact, the Supreme Court specifically cited its decision in *Cardinal Chemical* as a basis for rejecting the Federal Circuit's prior two-prong "reasonable apprehension of suit" test used by the *Super Sack* court. *MedImmune*, 127 S.Ct. at 774, n.11.

Even if the Court distinguished *Cardinal Chemical*, the result Enterasys suggests is contrary to Fed R. Civ. P. 41(a)(2), under which a court may not grant a plaintiff's request for voluntary dismissal "[i]f a counterclaim has been pleaded by a defendant" and this counterclaim could not "remain pending for independent adjudication by the court" in the absence of the plaintiff's claim.  According to Enterasys, a plaintiff can bypass this Rule 41(a)(2) limitation, as Enterasys attempts to do here, by announcing at any time before judgment that it is abandoning its claim and relinquishing any right to pursue it in the future.  In other words, so long as a plaintiff is willing to accept the dismissal of its infringement claims, jurisdictional principles would demand both that the plaintiff must be allowed to do so and that the opposing party's counterclaim must also be dismissed as moot, without the need or ability to invoke the mechanism of Rule 41(a)(2) or secure the "order of the court" mandated under that provision.

The Supreme Court has "emphasized the importance to the public at large of resolving questions of patent validity," and has cautioned that undue restraint in the courts' consideration

of such questions may "prolong[] the life of invalid patents" and "encourage[] endless litigation (or at least uncertainty) over the validity of outstanding patents." *Cardinal Chem.*, 508 U.S. at 100-02.  Enterasys has not suggested a viable basis for the Court to decline to exercise its discretionary power to decide Extreme Networks' proposed counterclaims on the '042 patent and to thwart this important policy objective.  To the contrary, it is difficult to view Enterasys' tactics in this case as anything other than an attempt to pull the jurisdictional rug out from under a counterclaim that it cannot defend on the merits, after forcing Extreme Networks to expend significant efforts and resources in defending Enterasys' '042 infringement claims.  The parties have proceeded through discovery to this point without Enterasys having affirmatively withdrawn its allegations of infringement of the '042 patent, and Extreme Networks has filed a motion to amend to assert its counterclaims as to the invalidity and unenforceability of this patent.  It is too late in the day for Enterasys to now contend in response to Extreme Networks' motion that the Court should refrain from permitting Extreme Networks to assert this matter.  In light of all of these considerations, the Court should allow Enterasys to assert its '042 patent counterclaims.

III.   **EXTREME NETWORKS' PROPOSED AFFIRMATIVE DEFENSES AND COUNTERCLAIMS ARE NOT UNTIMELY**

A.   **The Co-Pending Massachusetts Litigation is Not an Extension of the Present Case and Cannot Relieve Enterasys from Complying with its Discovery Obligations and the Federal Rules.**

The facts in support of Extreme Networks' proposed affirmative defenses and counterclaims were developed based upon prior art, documents and testimony recently obtained by Extreme Networks' counsel in the Wisconsin case.  Crucial to Enterasys' opposition to Extreme Networks' Motion to Amend is its continual treatment of a 2005 patent infringement action Enterasys filed against Extreme Networks and Foundry Networks in Massachusetts as an

extension of the present litigation.  (The Massachusetts litigation has been stayed pending the reexamination of the patents Enterasys asserted in that case).  The two cases are separate and distinct, are directed to different patents involving different claimed subject matter and are being handled, at least on Extreme Networks' behalf, by two different teams of lawyers.

While Enterasys is being represented in both cases by the same team of lawyers in the Boston Offices of the Robins Kaplan law firm, Extreme Networks is being represented in the Massachusetts litigation by a team of lawyers from the Palo Alto office of McDermott Will & Emery and represented in the Wisconsin litigation for pretrial and discovery matters primarily by a separate team of lawyers in McDermott Will & Emery's Chicago office.  (*See* Stolte Decl. ¶¶ 3-4.)  None of the McDermott Will & Emery Chicago lawyers have been involved in the Massachusetts litigation and have very limited knowledge of the issues, patents, prior art or other matters involved in that litigation.  (*Id*.)  Because the patents involved in the Wisconsin litigation are directed to completely different claimed subject matter, Extreme Networks' preparation of its non-infringement, invalidity and unenforceability defenses and proposed counterclaims has been developed independently of what transpired in the Massachusetts litigation.  (*Id*. at ¶ 5.)

Enterasys mischaracterizes the agreement between the parties relating to the use of documents produced in the Massachusetts case.  The parties agreed that "each *may utilize* as if produced in this litigation any and all documents previously produced by any party in the Boston litigation."  (Dkt. Nos. 24-25, Protective Order, ¶19 (emphasis added).)  That agreement only provided that a party has the ability to affirmatively rely on any documents produced in the Massachusetts case.  This limited agreement, however, did not relieve either party of its obligation under the Federal Rules to produce information or documents responsive to the discovery requests served in the Wisconsin litigation.

The parties produced documents accounting for many hundreds of thousands of pages in the Massachusetts litigation.  (Stolte Decl. ¶ 6.)  The parties have produced hundreds of thousands of pages in the Wisconsin litigation.  (*Id.*)  It would require a Herculean effort, as well as a tremendous waste of resources, for Extreme Networks' Chicago team of McDermott Will & Emery lawyers to review each and every document the parties produced in the Massachusetts litigation, on the chance that some documents may be relied on by Enterasys in the Wisconsin case.  If Enterasys is planning to rely on or "utilize" a particular document in the Massachusetts litigation for purposes of this Wisconsin action, Enterasys is required to so notify Extreme Networks.  The more appropriate course of conduct, of course, is to produce any documents responsive to discovery requests served in this litigation.

B.     **Enterasys Did Not Timely Produce Documents on Which Extreme Networks Relies in Support of its Proposed Counterclaims.**

Extreme Networks' filed its Complaint in the present case on April 20, 2007, asserting three patents against Enterasys.  Enterasys filed its Answer and Counterclaims, asserting infringement of the '181, '727 and '042 patents on May 30, 2007.  Extreme Networks filed its Reply to Enterasys' Counterclaims on June 25, 2007.  The Court's deadline for filing amendments to the pleadings without leave was scheduled one week later, on July 2, 2007.  On July 31, 2007, Extreme Networks served a second set of document requests requesting production of documents relating to the asserted Enterasys patents, including, but not limited to:

- documents that are, or have been alleged to be, or considered to be prior art to the Enterasys patents (Request No. 66);

- documents relating to any communications by the inventors of the Enterasys patents regarding the subject matter claimed or disclosed in the Enterasys patents, including articles and other publications (Request No. 81); and

- documents showing any disclosures of the Enterasys patents to any industry standard setting organizations (Request No. 95).

(*See* Stolte Decl. ¶ 9.)  In its response to each of these requests, served on August 31, 2007, Enterasys stated that it would produce non-privileged documents.  (*Id.*)

Yet, Enterasys never produced in this litigation the prior art '437 patent on which Extreme Networks is relying for its invalidity and unenforceability defenses and counterclaims with respect to the '727 patent, despite that (i) Enterasys owns and knew about the '437 patent,[3] (ii) the '437 patent discloses and claims a device that routes data packets that conform to certain protocols suites and bridges data packets that conform to other protocol suites, similar to the claimed subject matter of the '727 patent, and (iii) a named inventor of the '437, Radia Perlman, was also a purported inventor of the '727 patent.  (Stolte Decl. ¶¶ 10-11.)  As discussed above, this appears to be a pattern because Enterasys admittedly never produced documents relating to the prior art ATX Lan Switch either, which also is Enterasys' own key prior art on which Extreme Networks relies in support of its invalidity and unenforceability counterclaims on the '042 patent.

Similarly, by its own admission, Enterasys did not timely produce the RFC 1195 written by Ross Callon on which Extreme Networks relies with respect to its equitable estoppel counterclaim and affirmative defense to the '727 patent.  Enterasys delayed producing that document until October 9, months after Extreme Networks served its document requests.

Moreover, simply because Enterasys finally produced the RFC 1195 on October 9 does not mean that Extreme Networks had the chance to fully develop its equitable estoppel defense based on that document at the time it was produced.  In fact, it was only during Ross Callon's

---

[3] Enterasys claims that Extreme Networks cited the '437 patent in a supplemental response to Enterasys' Interrogatory No. 11 on March 1, 2007 in the Massachusetts litigation and identified the '437 patent as prior art to the '205 patent asserted in that litigation.  While Extreme Network's Chicago team of lawyers was unaware of this citation of the '437 patent as prior art to the '205 patent, Enterasys' counsel, which is responsible for both litigations, apparently did know of this prior art, yet failed to produce it in the Wisconsin action.

November 28 deposition that Extreme Networks learned that RFC 1195 was intended to set forth a new industry standard, that many members of the network industry actually adopted the standard and that Callon could not recall whether he or anyone else at Digital Equipment Corporation (Callon's then employer) informed the Internet Engineering Task Force that Digital Equipment was at the same time also seeking patent protection for portions of the subject matter of the proposed standard.  (*See* Dkt. No. 81, Callon Dep., pp. 28-40, 63-79, 184; *see also* Dkt. No. 69, Ottman Dep., pp. 99-104.)  Extreme Networks could not have asserted its equitable estoppel defense and counterclaim until it learned of this necessary information.

Enterasys attempts to justify its failure to timely produce the documents upon which Extreme Networks now relies in support of its new defenses and counterclaims by arguing that the '437 and the '727 patent file history had previously been produced in the Massachusetts litigation.  (Enterasys does not bother to explain why it never produced the ATX documents at all or delayed producing the RFC 1195.)  As stated above, that these documents may have been produced in the Massachusetts case did not relieve Enterasys from the obligation under the Federal Rules to timely produce information and documents responsive to Extreme Networks' discovery requests served in this case.  Moreover, that the '437 patent may have been produced and cited in the Massachusetts case as prior art to the '205 patent (one of the patents-in-suit in the Massachusetts action) is irrelevant.  The claimed subject matter of the '205 and '727 patents are widely different.  That was the reason the U.S. Patent Office required that the claims that ultimately issued in the '727 patent be filed in a divisional application.  The fact that Extreme Network's counsel in the Massachusetts case deemed the '437 patent material prior art to the '205 patent does not mean that the patent was necessarily material prior art to the '727 patent.

-13-

**C.     The Facts in Support of Extreme Networks' Proposed Counterclaims
and Affirmative Defenses Here Are Independent of the Massachusetts Case.**

The Wisconsin litigation team learned of the '437 patent, not from the Massachusetts

document production or pleadings, but from an independent prior art search conducted by

counsel in October.  (Stolte Decl. ¶ 12.)  Extreme Networks produced the '437 patent and its

prosecution history shortly thereafter. (*Id*. at ¶ 13.)  Similarly, the mysterious discrepancy

between the sole inventor named in the initial application that ultimately issued as the '727

patent[4] (Ross Callon) and the four inventors presently named by virtue of a certificate of

correction (Callon, Radia Perlman, Eric Rosen and John Harper) was noticed by counsel during a

thorough review of the '727 prosecution history (which accounts for many hundreds of pages) at

about the same time.  (Stolte Decl. ¶ 15.)  In view of this discrepancy, Extreme Networks could

not know which of the differing sets of inventors was accurate.

However, during the Rule 30(b)(6) deposition of Randy Ottman on November 27, Mr.

Ottman testified that, in Enterasys view, the properly named inventors of the '727 patent were

the four listed in the certificate of correction.  (Dkt. No. 69, Ottman Dep., pp. 97-99, 127-28.)

Ross Callon also testified during his November 28 deposition that he believed at least Radia

Perlman was a co-inventor of the '727 patent.  (Dkt. No. 81, Callon Dep. pp. 92-96.)  Thus, it

was only after these depositions that Extreme Networks obtained sufficient information that Ms.

Perlman was a co-inventor such that she had a duty of candor to the U.S. Patent and Trademark

Office during the time the '727 patent application was pending.  If Ms. Perlman was not a

---

[4] The application was filed in the name of Ross Callon alone.  When the U.S. Patent Office issued a filing receipt in the names of Callon, Perlman, Rosen and Harper, the applicant filed a petition to correct the filing receipt which pointed out that only Ross Callon was an appropriately named inventor.  When a continuation application was filed, again, only Ross Callon was a named inventor.  After the '727 patent issued in the name of Ross Callon alone, a certificate of correction was filed naming Callon, Perlman, Rosen and Harper as inventors.  (Stolte Decl. ¶ 15.)

properly named inventor, she likely would not have had such a duty, and her failure to inform the U.S. Patent Office of her prior '437 patent would not constitute a breach of the duty of candor or inequitable conduct.

Moreover, in interrogatory responses, Enterasys has asserted, with no support, an invention date for the '727 patent in September of 1989.  If this is true, the '437 patent would not necessarily be prior art to the '727 patent, since the application that issued as the '437 patent was filed in the summer of 1990.  During his deposition on November 28, however, Mr. Callon expressed considerable doubt that he conceived of the '727 patent subject matter in 1989, and admitted that it was at some unknown date in 1990 that he conceived of the invention.  (Dkt. No. 81, Callon Dep. pp. 63-66, 132-34, 139-40.)

Therefore, Mr. Callon's testimony was necessary before Extreme Networks could rely upon the '437 patent as prior art in support of its unenforceability affirmative defenses and counterclaims.  Even had Extreme Networks' Chicago counsel known of the '437 patent and the contents of the '727 patent file history from the Massachusetts litigation, crucial information required for well-pled unenforceability and equitable estoppel affirmative defenses and counterclaims remained unknown until the Ottman and Callon depositions on November 27 and 28, 2007.

      **D.**     **Extreme Networks Did Not Delay Taking Depositions.**

Enterasys' criticism that Extreme Networks delayed in taking depositions is unfounded. Neither party took inventor depositions or substantive Rule 30(b)(6) depositions until after they finished briefing claim construction in this case.  Enterasys issued subpoenas for five inventors of the Extreme Networks' patents on October 17, and Extreme Networks issued subpoenas to five inventors of the Enterasys patents on October 22 and issued notices of Rule 30(b)(6) depositions on October 19, noticing the Rule 30(b)(6) deposition dates for November 5 and 6.

(Stolte Decl. ¶ 17.)  Enterasys only offered its Rule 30(b)(6) witnesses for the last week of November, so the earliest opportunity Extreme Networks had to depose Messrs. Ottman, Sodder and Martin was between November 27 through November 30.  (Stolte Decl. ¶ 18.)  Between November 1 and December 3, the parties conducted each of their respective Rule 30(b)(6) depositions, Enterasys took five inventor depositions and Extreme Networks took the deposition of Mr. Callon, an Enterasys inventor.  Thus, within that short time frame, the parties took a total of eleven depositions (the four Rule 30(b)(6) depositions accounting for two days each) in such disparate locations as Raleigh-Durham, Palo Alto, and Boston.  (Stolte Decl. ¶ 19.)

Given the amount of time and effort necessary to prepare for and participate in this many depositions spread throughout the country, Enterasys' cavalier suggestion that Extreme Networks was not diligent in scheduling depositions is without merit.  Enterasys can hardly fault Extreme Networks for taking Enterasys' Rule 30(b)(6) depositions on the only dates that Enterasys made its witnesses available and after completion of claim construction.  Extreme Networks scheduled Mr. Callon's deposition on the only date that Extreme Networks' counsel, Enterasys' counsel, Callon's counsel and Callon were all available, i.e., November 28.  (Stolte Decl. ¶ 20.)  Extreme Networks is discussing with the four remaining Enterasys inventors, including Radia Perlman, available deposition dates and will schedule them soon.  (*Id.* at ¶ 21.) Extreme Networks also intends to issue subpoenas on the attorneys who assisted in the prosecution of the '727 patent.  (*Id.*)  With discovery closing on April 18, 2008, there was no need for the parties to schedule all inventor and Rule 30(b)(6) depositions before the initial expert reports were due on December 7, as Enterasys suggests.  In fact, it would have been virtually impossible for the parties to accomplish that goal.

**E.   Enterasys Does Not Justify its Objections to the
       Proposed Noninfringement and Invalidity Counterclaims.**

While plainly conceding that the work involved in responding to Extreme Network's non-infringement and invalidity counterclaims is substantially the same as the work involved in responding to Extreme Network's affirmative defenses on those issues, Enterasys nevertheless makes a half-hearted objection to the counterclaims.  Enterasys does not, and cannot, claim that these counterclaims pose any prejudice whatsoever, and any delay in asserting the counterclaims is a nullity since, as it admits, Enterasys is already engaged in rebutting Extreme Network's non-infringement and invalidity positions and proofs.  Moreover, "delay, standing alone, may prove an insufficient ground to warrant denial of leave to amend the complaint; rather the degree of prejudice to the opposing party is a significant factor in determining whether the lateness of the request ought to bar filing."  *Williams v. Doyle*, 494 F. Supp.2d 1019, 1031 (W.D. Wis. 2007) (quoting *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792 (7th Cir. 2004)).

**IV.   ENTERASYS' CLAIMS OF PREJUDICE ARE BASELESS**

At the time that Extreme Networks disclosed the Honorable Gerald Mossinghoff as an expert, it had not yet obtained sufficient factual support to allege inequitable conduct claims that could pass muster under Fed. R. Civ. P. Rule 11.  In fact, Extreme Networks notified Enterasys that it may rely upon Mr. Mossinghoff as an expert on October 19 principally because initial expert reports were then scheduled to be due on November 16. To preserve its rights to rely upon Mr. Mossinghoff as a general patent law expert, and possibly one that could also opine on inequitable conduct assuming a basis for inequitable conduct was discovered, it was necessary to give adequate notice to Enterasys.  (Stolte Decl. ¶ 22.)  Enterasys' assumption that Extreme Networks must have developed the facts it required to assert a claim for inequitable conduct by October 19 is simply baseless conjecture.

By identifying Mr. Mossinghoff, a former U.S. Commissioner of Patents and Trademarks and a well known patent law expert, Extreme Networks placed Enterasys on notice that it should secure its own patent law expert, if it desired to do so, to rebut any testimony Mr. Mossinghoff might offer at trial on any patent law issue, which potentially included inequitable conduct. Thus, Enterasys cannot now claim prejudice for its own failure to obtain a patent law expert after receiving notice of Extreme Networks' reliance on Mr. Mossinghoff. Moreover, Enterasys has had Mr. Mossinghoff's expert report since December 7, providing Enterasys over a month by which to secure a patent law expert to address the straightforward opinions expressed by Mr. Mossinghoff.

Enterasys' claim that it is prejudiced and "in an untenable position" because "Enterasys must locate an expert to opine on the issues of inequitable conduct and equitable estoppel" (Enterasys Br., p. 12) is nonsense at best. On December 12, 2007, Enterasys notified Extreme Networks that it would be relying on the expert testimony of James T. Carmichael and provided Mr. Carmichael's Curriculum Vitae. (Stolte Decl. ¶ 23.) Based on Mr. Carmichael's lengthy tenure as an Associate Solicitor, an Examiner in Chief and an Administrative Patent Judge at the U.S. Patent and Trademark Office, there is no doubt that Mr. Carmichael's intended role is as a patent law expert and he is intended to rebut Mr. Mossinghoff's opinions.[5]  (*Id.*)

Enterasys' claim that it needs additional time for its own patent law expert to prepare a rebuttal report is equally groundless. The factual allegations in support of Extreme Network's proposed defenses and counterclaims have been comprehensively set forth in the expert reports of Mr. Mossinghoff and Dr. Kesidis (Stolte Decl. ¶ 24), and little additional discovery efforts, if any, are necessary to prepare a rebuttal to Mr. Mossinghoff's opinions. *See Silicon Graphics,*

---

[5] Mr. Carmichael signed a confidentiality undertaking on December 11, 2007. Thus, Enterasys secured a rebuttal patent law expert within two business days of receiving Mossinghoff's expert report.

*Inc. v. Ati Techs., Inc.*, Case No. 06-C-611-C, 2007 U.S. Dist. LEXIS 43782, * 27-28 (W.D. Wis. June 14, 2007) (observing that "the prejudice of engaging in run-of-the-mill discovery is [not] so significant that [the Court] should ignore the general rule that leave to amend should be 'freely given'").

Enterasys is no more at a disadvantage based on the proposed defenses and counterclaims than Extreme Networks is, based on Enterasys' unjustified delay in giving notice of its invalidity contentions.  Enterasys waited until it served its own invalidity expert report before providing a detailed explanation for its invalidity contentions against Extreme Networks' patents, giving Extreme Networks only a month to analyze and rebut the bases for invalidity.  In its First Set of Interrogatories (Interrogatory No. 3) dated June 1, 2007, Extreme Networks requested that Enterasys describe in detail, on an element by element basis, the factual and legal bases for Enterasys' invalidity counterclaims.  (Stolte Decl. ¶ 25.)  In its initial response, dated June 29, Enterasys provided no information whatsoever.  (*Id.*)  Despite subsequent requests that Enterasys provide a detailed explanation for its invalidity claims against the Extreme Networks' patents, Enterasys served a supplemental response to Interrogatory No. 3 on August 31, which merely identified numerous pieces of prior art on which it intended to rely, but provided absolutely no analysis or commentary on the relevance of the prior art to the asserted claims.  (Stolte Decl. ¶ 26.)

Furthermore, in her initial expert report served on December 7, Enterasys' purported expert relied on *at least four prior art references that Enterasys never before identified, three of which it never even produced until it served its expert report*.  (Stolte Decl. ¶ 27.)  One of these prior art references never identified or produced (the Cisco Lightstream 1010 ATM switch) is being cited in an attempt to invalidate every claim of the three asserted Extreme Networks

-19-

patents, and a second reference never before identified or produced (the Demers article) is being used to invalidate at least 9 of the asserted claims of the Extreme Networks patents.  (*Id.*)  Thus, Enterasys completely blindsided Extreme Networks by withholding until December 7 the most important prior art it now relies upon to invalidate Extreme Networks' patents.  In response to Extreme Networks' objections, Enterasys stated in December 27 letter:  "Any new art was produced along with the expert report, and, therefore, there is no basis on which Extreme cannot respond to that report in the proper time frame."  (Stolte Decl. ¶ 28.)  In view of its own delay tactics, Enterasys is hardly in a position to complain about prejudice when its expert will also have a month to evaluate the straightforward opinions of Mr. Mossinghoff.

## V.     <u>CONCLUSION</u>

Based on the foregoing reasons, Enterasys' arguments in its responsive brief are without merit. Extreme Networks respectfully requests that this Court grant its Motion to Amend Pleading.

Dated: December 27, 2007                    Respectfully submitted,

                                            EXTREME NETWORKS, INC.

                                            By:     ___/s/ Margaret M. Duncan_____
                                                    James D. Peterson (No. 1022819)
                                                    Godfrey & Kahn, S.C.
                                                    One East Main Street
                                                    P.O. Box 2719
                                                    Madison, WI  53701-2719
                                                    Telephone:  608.257.3911
                                                    Facsimile:  608.257.0609
                                                    E-mail:  jpeterson@gklaw.com

                                                    Margaret M. Duncan
                                                    John G. Bisbikis
                                                    Amol A. Parikh
                                                    McDermott Will & Emery LLP
                                                    227 West Monroe Street, Suite 4400
                                                    Chicago, Illinois  60606-5096
                                                    Telephone:  312.372.2000
                                                    Facsimile:  312.984.7700

                                                    Attorneys for Plaintiff,
                                                    Extreme Networks, Inc.

mn334809_1