IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXTREME NETWORKS, INC.,

OPINION AND ORDER

Plaintiff and Counter Defendant,

07-cv-229-bbc

v.

ENTERASYS NETWORKS, INC.,

Defendant and Counter Plaintiff.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In the world of patents, there are two kinds of people: inventors and imitators.  In this civil action for patent infringement, each party insists that it is the inventor and the other party is the imitator.  Although defendant Enterasys Networks, Inc. has failed to show that plaintiff Extreme Networks, Inc. is imitating defendant, a trial is necessary to determine whether defendant is imitating plaintiff.

The parties describe themselves as competitors "in the business of designing, developing, marketing and supporting . . . networking products."  Plaintiff contends that defendant is infringing three patents related to these products:  U.S. Patents Nos. 6,104,700, 6,678,248, and 6,859,438; defendant has filed counterclaims in which it

1

contends that plaintiff is infringing  U.S. Patents Nos. 5,195,181 and 5,430,727.  I construed a number of disputed terms in these patents in an opinion and order dated November 21, 2007.  (Interestingly enough, despite the hundreds of pages the parties' devoted to their claims construction briefs, neither party relies on this court's constructions in any significant way.  Instead, both parties raise new issues of construction with little or no explanation for their failure to raise the issues earlier.)

Plaintiff has moved for summary judgment with respect to defendant's counterclaims, contending both that defendant cannot prove infringement of any of the asserted claims and that those claims are invalid as anticipated, obvious or indefinite.  Both parties have moved for partial summary judgment with respect to various claims asserted by plaintiff.  (As is often the case, the parties have identified these as "motions for summary judgment," but it is clear from the context of their motions that neither party is seeking summary judgment with respect to all of plaintiff's claims.)

In addition, defendant seeks a determination that plaintiff is not entitled to damages for any infringement that may have occurred before this lawsuit was filed and a determination that the date of invention for plaintiff's patents is August 29, 1997.  Finally, plaintiff has moved to "strike" a supplemental expert report submitted by defendant on the ground that it contains new opinions that are not directly responsive to anything in plaintiff's expert report.

Plaintiff's motion for summary judgment will be granted with respect to defendant's counterclaims. Defendant has failed to adduced evidence from which a reasonable jury could find that plaintiff's products infringed any of defendant's asserted claims. Both parties' motions for partial summary judgment must be denied with respect to plaintiff's claims for infringement because of factual disputes regarding the operation of the accused devices. In addition, I must deny defendant's request to determine the date of invention for plaintiff's asserted claims. Because defendant has failed to identify any claim or defense to which it would be relevant, making such a determination would constitute an advisory opinion. However, I will grant defendant's motion with respect to the limitation of damages issue. Because plaintiff has failed to show that it marked its products as required by 35 U.S.C. § 287(a), plaintiff is not entitled to seek damages for any allegedly infringing acts before it gave actual notice of infringement to defendant on April 20, 2007, the day this lawsuit was filed.

Defendant's motion to "strike" defendant's supplemental expert report will be denied as unnecessary; I did not need to consider any of the opinions in that report to resolve any of the motions for summary judgment.

## PLAINTIFF'S PATENTS

Invention: mechanism for managing, monitoring, and prioritizing traffic within a computer

3

network

Asserted Claims:       10, 13, 14, 21, 26, 28, and 29 of the '700 patent; claims 1 and 15 of
the '248 patent; claims 1 and 5, of the '438 patent.

Accused Devices:    X-Pedition 8000 Enterprise Backbone Switch router, X-Pedition 8600
Enterprise Backbone Switch router and Matrix X router.


UNDISPUTED FACTS

Plaintiff is the assignee of U.S. Patents Nos. 6,104,700, 6,678,248, and 6,859,438.
Each of the patents claims a priority filing date of August 29, 1997 based on Provisional
Application No. 60/057,371.  The patents share a common specification and generally
disclose a mechanism for monitoring and prioritizing traffic within a network and allocating
bandwidth to achieve Quality of Service, which is abbreviated as QoS in the patents. (In the
November 21 order, I construed "quality of service" to mean "a quantifiable measure of
service provided.")


A. Claims in Issue

1.  '700 patent

_____Claim 10 of the '700 patent discloses:

A method of bandwidth management and traffic prioritization for use in a network

4

of devices, the method comprising the steps of:

defining at a packet forwarding device information indicative of one or more traffic groups;

defining at the packet forwarding device information indicative of a quality of service (QoS) policy for at least one of the one or more traffic groups;

receiving a packet at a first port of a plurality of ports;

identifying a first traffic group of the one or more traffic groups with which the packet is associated;

providing a plurality of QoS queues;

mapping the first traffic group to a first QoS queue of the plurality of QoS queues; and

scheduling the packet for transmission from a second port of the plurality of ports based upon the QoS policy for the first traffic group, and wherein the scheduling is independent of end-to-end signaling; said scheduling including:

determining a current bandwidth metric for each of the plurality of QoS queues;

dividing the plurality of QoS queues into at least a first group and a second group based upon the current bandwidth metrics and a minimum bandwidth requirement associated with each of the plurality of QoS queues; and

if the first group includes at least one QoS queue, then transmitting a packet from the at least one QoS queue; otherwise transmitting a packet from a QoS queue associated with the second group.

Claim 13 discloses:

A method of bandwidth management and traffic prioritization for use in a network of devices, the method comprising:

5

receiving at a packet forwarding device information indicative of one or more traffic groups, the information indicative of the one or more traffic groups including Internet Protocol (IP) subnet membership;

receiving at the packet forwarding device information defining a quality of service (QoS) policy for at least one of the one or more traffic groups, the QoS policy including at least a minimum bandwidth;

providing a plurality of queues at each of a plurality of output ports;

associating the one or more traffic groups with the plurality of queues based upon the minimum bandwidth; and

scheduling a packet for transmission from one of the plurality of queues onto the network.

Claim 14 discloses:

A method of bandwidth management and traffic prioritization for use in a network of devices, the method comprising:

providing a plurality of quality of service (QoS) queues at each of a plurality of output ports, each of the plurality of QoS queues associated with a minimum queue bandwidth requirement;

adding a packet to one of the plurality of QoS queues based upon a traffic group with which the packet is associated; and

scheduling a next packet for transmission onto the network from one of the plurality of QoS queues at a particular output port of the plurality of output ports by:

determining a current bandwidth metric for each of the plurality of QoS queues,

dividing the plurality of QoS queues into at least a first group and a second group based upon the current bandwidth metrics and the minimum queue bandwidth requirements, and

6

if at least one QoS queue of the plurality of QoS queues, so divided, is associated with the first group, then transmitting a packet from the at least one QoS queue; otherwise transmitting a packet from a QoS queue of the plurality of QoS queues associated with the second group.

Claim 21 discloses:

A packet forwarding device for use in a network employing a non-deterministic assess protocol, the packet forwarding device comprising:

a filtering and forwarding engine configured to forward received packets based upon a traffic group with which the packet is associated; and

a plurality of ports coupled to the filtering and forwarding engine, each port of the plurality of ports configured to receive packets from the filtering and forwarding engine, each port of the plurality of ports having a plurality of Quality of Service (QoS) queues associated with a minimum queue bandwidth requirement, each port of the plurality of ports further configured to schedule a packet for transmission onto the network by determining a current bandwidth metric for each of the plurality of QoS queues,
dividing the plurality of QoS queues into at least a first group and a second group based upon the current bandwidth metrics and the minimum queue bandwidth requirements, and

if at least one QoS queue of the plurality of QoS queues, so divided, is associated with the first group, then transmitting a packet from the at least one QoS queue; otherwise transmitting a packet from a QoS queue of the plurality of QoS queues associated with the second group.

Claim 26 discloses:

A method of bandwidth management and traffic prioritization for use in a network of devices, the method comprising:

receiving at a packet forwarding device information indicative of one or more traffic groups, the information indicative of the one or more traffic groups including a virtual local area network (VLAN) identifier;

7

receiving at the packet forwarding device information defining a quality of service (QoS) policy for at least one of the one or more traffic groups, the QoS policy including at least a minimum bandwidth;

providing a plurality of queues at each of a plurality of output ports;

associating the one or more traffic groups with the plurality of queues based upon the minimum bandwidth; and

scheduling a packet for transmission from one of the plurality of queues onto the network.

Claim 28 discloses:

A machine-readable medium having stored thereon data representing sequences of instructions, said sequences of instructions which, when executed by a processor, cause said processor to:

define at a packet forwarding device information indicative of one or more traffic groups;

define at the packet forwarding device information indicative of a quality of service (QoS) policy for at least one of the one or more traffic groups;

receive a packet at a first port of a plurality of ports;

identify a first traffic group of the one or more traffic groups with which the packet is associated;

provide a plurality of QoS queues;

map the first traffic group to a first QoS queue of the plurality of QoS queues; and

schedule the packet for transmission from a second port of the plurality of ports based upon the QoS policy for the first traffic group, and wherein the scheduling is independent of end-to-end signaling; said scheduling including:

8

determining a current bandwidth metric for each of the plurality of QoS queues;

dividing the plurality of QoS queues into at least a first group and a second group based upon the current bandwidth metrics and a minimum bandwidth requirement associated with each of the plurality of QoS queues; and

if the first group includes at least one QoS queue, then transmitting a packet from the at least one QoS queue; otherwise transmitting a packet from a QoS queue associated with the second group.

Claim 29 discloses:

A machine-readable medium having stored thereon data representing sequences of instructions, said sequences of instructions which, when executed by a processor, cause said processor to:

provide a plurality of quality of service (QoS) queues at each of a plurality of output ports, each of the plurality of QoS queues associated with a minimum queue bandwidth requirement;

add a packet to one of the plurality of QoS queues based upon a traffic group with which the packet is associated; and

schedule a next packet for transmission onto the network from one of the plurality of QoS queues at a particular output port of the plurality of output ports by:

determining a current bandwidth metric for each of the plurality of QoS queues,

dividing the plurality of QoS queues into at least a first group and a second group based upon the current bandwidth metrics and the minimum queue bandwidth requirements, and

if at least one QoS queue of the plurality of QoS queues, so divided, is associated with the first group, then transmitting a packet from the at least one QoS queue; otherwise transmitting a packet from a QoS queue of the plurality of QoS queues associated with the second group.

9

2.  <u>'248 patent</u>:

    Claim 1 of the '248 patent discloses:

     A method for bandwidth management in a packet forwarding device, comprising:

    identifying a quality of service (QoS) metric corresponding to a traffic group, the QoS metric defining a minimum QoS for the traffic group;

    receiving a data packet associated with the traffic group;

    placing the data packet into one of a plurality of queues;

    identifying a current measure of network performance with respect to parameters specified in the QoS metric; and

    removing the data packet from the queue if a difference between the current measure and the minimum QoS falls within a threshold.


    Claim 15 discloses:

An article of manufacture comprising a machine accessible medium having content that when accessed provides instructions to cause an electronic system to:

    identify a quality of service (QoS) metric corresponding to a traffic group, the QoS metric defining a minimum QoS for the traffic group;

    receive a data packet associated with the traffic group;

    place the data packet into one of a plurality of queues;

    identify a current measure of network performance with respect to parameters specified in the QoS metric; and

    remove the data packet from the queue if a difference between the current measure and the minimum QoS falls within a threshold.

3. '438 patent:

        Claim 1 of the '438 patent discloses:

        A method of data communications, comprising:

        receiving a data packet having classification information;

        identifying a Quality of Service (QoS) to associate with the data packet based at least in part on the classification information;

        placing the data packet in a QoS queue corresponding to the associated QoS; and

        scheduling the data packet to be transmitted with other data packets from the QoS queue at or above a minimum bandwidth allocation corresponding to the associated QoS.

        Claim 5 discloses:

        A network device comprising:

        a receive port to receive a data packet having classification information;

        a logic circuit to identify a Quality of Service (QoS), to associate with the data packet based at least in part on the classification information, and place the data packet in a QoS queue corresponding to the associated QoS; and

        a scheduler to dequeue the data packet with other data packets from the QoS queue and allocated at least a minimum bandwidth corresponding to the associated QoS for transmission.

B. Defendant's Accused Devices

1. Matrix X

_____The Matrix X is a router, which is one type of device that forwards computer data from one end system to another.  In the Matrix X, the packet forwarding architecture includes a forwarding engine chip, a queuing engine chip, and a switching engine chip. The forwarding engine chip is the FE-1000; the queuing engine chip is either a QE-1000 chip or QE-2000 chip; and the switching element chip is the BME-3200.  With respect to quality of service features, the functionality of the QE-1000 chip and the QE-2000 chip is the same. Defendant began using the QE-2000 in September 2007.

The QE-1000 and QE-2000 chips are designed by Sandburst, a third party, which has since been formally acquired by Broadcom.  Defendant programmed the QE-1000 using programming guides and datasheets from Broadcom.

a.  Weighted fair queuing

The data sheets for both the QE-1000 and the QE-2000 chips state that the chips support weighted fair queuing.  In defendant's "Hardware and Software Overview" for the Matrix X, defendant describes the product as "allow[ing] bandwidth guarantees" and performing "weighted fair queuing" and "traffic shaping."

Defendant conducted a test of the weighted fair queuing feature in the Matrix X on September 9, 2005.  The "bug report" for this test states the following: "Egress queue throughput not consistent with configured Weighted Fair Queuing values . . . Weighted fair

12

queuing doesn't work as expected.  Traffic not passed through queues as expected."  A second test performed on September 12, 2005 yielded similar results.  As of November 8, 2005, defendant included instructions in its release notes to customers that the Matrix X could not perform weighted fair queuing. (The parties dispute whether the Matrix X could perform weighted fair queuing at any time.)

b. Traffic shaping

Defendant's "Command Line Interface Reference Guide" for the Matrix X includes a command called "set traffic-profile."  One of the parameters for that command is "bw-limit" bandwidth parameter, which "specifies the upper bandwidth to limit (shape) the rate, ranging from 1 to 10,240 Mbps.  This parameter specifies the maximum rate for the queue to deliver packets."  Another parameter is "weight," which "[s]pecifies WFQ queuing mode for the traffic profile being configured.  The value specifies guaranteed bandwidth, ranging from 1 to 10,240 Mbps."

The data sheet for the QE-1000 chip states that the chip "provides the ability to traffic shape, or rate limit, the amount of data transmitted to a Virtual Output Queue. . . . [E]ach queue is configured with a minimum frequency (*RATE*) and maximum (*MAX-RATE*) frequency."  (The parties dispute whether the Matrix performs traffic shaping.)

13

2.  Expedition routers

The X-Pedition 8000 is capable of forwarding 15 million packets per second; the X-Pedition 8600 is capable of forwarding 48 million packets per second.  The  March 2006 user reference manual for the Expedition routers states: "To prevent low-priority traffic from waiting indefinitely as higher priority traffic is sent, you can apply the weighted fair queuing (WFG) queuing policy to set a minimum bandwidth for each class."  (The parties dispute whether the accused devices provide a minimum bandwidth.)

C.  Marking of Plaintiff's Products

In December 2004, plaintiff began marking some of its patented products with labels identifying the patent number.

OPINION

A.  Infringement

Both parties are moving for partial summary judgment with respect to plaintiff's claims for infringement.  Defendant is seeking summary judgment with respect to all of plaintiff's claims against the Matrix X router.  Plaintiff is seeking summary judgment on its claims that defendant's X-Pedition routers infringe claim 15 of the '248 patent and claim 5 of the '438 patent and its claims that defendant's Matrix router infringes claims 21, 28

14

and 29 of the '700 patent, claim  15 of the '248 patent and claim 5 of the '438.

1.  Matrix X routers

All of the claims that plaintiff asserts against defendant's Matrix X Router include the elements of a "minimum bandwidth" or a "minimum QoS."  In the November 21 opinion and order, I construed "minimum bandwidth" to mean "smallest amount of data transmission capacity over a predefined period of time" and "minimum QoS" to mean "minimum quantifiable measure of service provided."  Although the parties have killed many trees arguing over whether the accused devices include these limitations, neither party discusses the meaning of the terms in the light of the court's constructions.  Instead, both sides make assumptions and raise questions regarding a number of issues with little effort devoted to demonstrating the correctness of their views.

For example, both parties discuss at great length whether the accused devices perform "weighted fair queuing" and "traffic shaping."  Neither party takes any pains to describe in any detail what those functions are, but each side takes turns assuming that the concepts satisfy the "minimum bandwidth" and "minimum QoS" requirements and then accusing the other of improperly making the same assumption.  The parties take a similar tack regarding whether "minimum bandwidth" and "minimum QoS" are synonymous with a guaranteed bandwidth.

15

The only thing that is clear from the parties' briefs is that there are factual disputes about the way the accused devices function.  Plaintiff relies on documents from both defendant and the third party manufacturer stating that the devices perform the allegedly infringing functions.  Defendant says that these documents are inaccurate because it has altered the products so that they cannot perform the functions, but I cannot conclude that it has shown this as a matter of law.  Defendant relies on its own expert's opinion and tests that it performed on the devices, but plaintiff disputes the legitimacy of both.  I conclude that neither party has shown that it is entitled to summary judgment.

### 2.  Expedition routers

The parties agree that defendant's Expedition routers perform weighted fair queuing (still with little description of what that is), but they disagree whether this function meets the limitations of the asserted claims.  (In its reply brief, plaintiff says that it "does not rely simply on weighted fair queuing in showing infringement of the asserted claims," dkt. #194, at 23, but it fails to develop any other argument.)  Again, there is a factual dispute regarding the manner in which defendant's products operate.  The user reference manual for defendant's Expedition routers states that the devices provide a minimum bandwidth but defendant's expert states that the manual is inaccurate because its products do not actually guarantee a bandwidth.  (There is again some dispute whether a "minimum bandwidth"

16

requires a "guaranteed" bandwidth.  Plaintiff suggests that a bandwidth guarantee is only "one way" of satisfying that element, dkt. #194, at 21 n. 12, but it has forfeited an argument with respect to any "other way" because it fails to develop one. ) The parties' cross motions for partial summary judgment must be denied with respect to plaintiff's claims that the accused devices infringe plaintiff's patents

## B. Pre-Suit Damages

Defendant seeks to limit plaintiff's damages to those that it incurred after April 20, 2007, the day plaintiff filed this lawsuit.  Defendant relies on 35 U.S.C. § 287(a), which requires patent holders to give actual or constructive notice of infringement to its competitors.  Plaintiff does not deny that it failed to give actual notice until it filed this lawsuit.  The question is whether it provided constructive notice by marking its own "patented article[s]" with the word "patent" and the relevant patent's number.  Id.  This is a question of fact that may be decided by the court only if no reasonable jury could find this standard satisfied.  Gart v. Logitech, Inc., 254 F.3d 1334, 1339 (Fed. Cir. 2001).

To satisfy the requirements of constructive notice, plaintiff must show that "substantially all of [its patented products] being distributed were marked, and that once marking was begun, the marking was substantially consistent and continuous."  Nike, Inc. v. Wal-Mart Stores, Inc., 138 F.3d 1437, 1446 (Fed Cir. 1998).  Plaintiff has failed to meet

17

its burden.  Plaintiff cites a number of different pieces of evidence to show that it began marking *some* products as early as December 2004, Plt.'s Supp. PFOF, ¶¶78-94, dkt. #177, such as testimony from its Fed. R. Civ. P. 30(b)(6) witness (whose most common answer to a question was some form of "I don't know") and photographs of products bearing the label, but plaintiff cites nothing from which a reasonable jury could infer that "substantially all" of its patented products were marked as of that date or any other.  In fact, plaintiff does not even acknowledge this standard in its brief.  If there is other evidence lurking in the record, plaintiff has not cited it.  Johnson v. Cambridge Industries, Inc., 325 F.3d 892, 898 (7th Cir. 2003) (district court is not required "to scour the record" in search of evidence to defeat motion for summary judgment; nonmoving party must identify with reasonable particularity evidence upon which it relies).

Accordingly, I conclude that defendant is entitled to partial summary judgment. Plaintiff may not recover damages for any infringement that occurred before it filed this lawsuit.

## C.  Date of Invention

Defendant believes that the date of invention for each of the asserted patents is August 29, 1997, when the provisional application of the '700 patent was filed; plaintiff believes the date of invention is August 16, 1996, when it gave a presentation on what it

says was the invention in the asserted patents.  The threshold problem with respect to this issue is that defendant fails to identify any reason for seeking a determination of the correct date.  The date of invention might be relevant to showing whether a particular reference is prior art for the purpose of an invalidity defense, 35 U.S.C. § 102(a), but defendant has neither raised any invalidity defenses in its motion for summary judgment nor suggested in its brief that it will do so at trial.  Without any indication of an actual dispute, I must assume that defendant is simply seeking an advisory opinion, to which defendant is not entitled.  Gerdau Ameristeel Corp. v. United States, 519 F.3d 1336, 1340 (Fed Cir. 2008).

## DEFENDANT'S PATENTS

### BACKGROUND

End systems such as computers and printers that form a computer network are interconnected by devices such as bridges, switches and routers. In order to forward data or information from one end system to another, the data or information is generally placed in formatted packets.  For example, when an originating end system wishes to transmit information to a destination end system, it generates a packet header in an appropriate format and then fills the remainder of the packet with the information to be transmitted. The header includes the address of the destination end system, among other information.

Forwarding devices may operate on three layers:  a physical layer, a data link layer

19

(layer 2) or a network layer (layer 3). Bridges operate at the data link layer to forward packets. Routers operate at the network layer. In forwarding packets, a router "examines the Layer 3 packet information and forwards packets based on their network-layer destination address." In normal operation, packets to be forwarded by a router will contain the router's data link layer address as the destination physical address. If the router knows how to forward a packet, it changes the data link layer address to that of the next hop and transmits the packet.

Unlike a router, a conventional bridge does not have a data link layer destination address and packets passing through the bridge are not addressed to the bridge. Thus, bridges forward packets without changing the physical addresses of the packet, which makes them "effectively transparent" to the user stations or hosts connected to the network.

## I. DEFENDANT'S U.S. PATENT NO. 5,195,181

Invention:      A system on a computer for streamlining the transmitting and receiving of

                messages between processors

Asserted Claims:      1, 6 and 7[1]

Accused Devices:      Black Diamond 6808, 8806, 8810, 10808, 12802R, 12804R and

---

[1] Plaintiff withdrew its allegations of infringement of claim 8 in its response brief. Dkt. #159, at 1 n.1.

12804C; Summit 48si, 200-24, 200-48, 300-24, 400, X250e, X450a,

X450e

## UNDISPUTED FACTS

### A.  The Claims in Issue

Defendant owns the rights to U.S. Patent No. 5,195,181, which is entitled "Message

Processing System Having Separate Message Receiving and Message Transmitting Processors

With Message Processing Being Distributed Between the Separate Processors."

Claim 1 discloses:

A computer system for transmitting messages in a computer network, which comprises:

a message receiving processor adapted to receive messages from the computer network;

a separate message transmitting processor coupled to the message receiving processor;

the message receiving processor operating to perform first preselected processing of a message received by the message receiving processor and to generate a digest of information relating to the message, the digest containing network protocol processing information for message transmit processing;

the message receiving processor transmitting the message and the digest [t]o the message transmitting processor;

the message transmitting processor operati[ng] to perform second preselected processing of the message using the network protocol processing information in the digest.

Claim 6 discloses:

A message receiving processor adapted to receive messages from a computer network, and to transmit received messages to a separate message transmit processor, which comprises:

a first module operating to perform first preselected processing of a message received by the message receiving processor and to generate a digest of information relating [t]o the message, the digest containing network communication protocol information for second preselected message transmit processing; and

a second module adapted to communicate the message and the digest [t]o the message transmit processor.

Claim 7 discloses:

A message transmit processor adapted for coupling to a separate message receive processor to receive messages from the message receive processor for transmission to a computer network, which comprises:

a first module adapted to receive a message and a digest relating to the message from the message receiving processor, the digest containing network communication protocol information for message transmit processing; and

a second module operating to perform preselected processing of the message using the network communication protocol information in [the] digest.

### B. Plaintiff's Accused Devices

Each of the accused devices includes one of two different chipsets for forwarding data packets: Genesis or Broadcom. Two different architectures are associated with the Genesis chipsets: Mariner and Olympic. The structures of the Mariner and Olympic architectures differ in material respects, but involve similar data packet ingress/egress processing

22

functionality. The Black Diamond 12802R, 12804R and 12804C switches include the Genesis/Olympic architecture and the Black Diamond 10808 switches employ the Genesis/Mariner architecture. The Broadcom chipset is used in the Black Diamond 8810 and 8806 and Summit 200 Series, 300 Series, 400, X250e, X450e and X450a.

In the Genesis chipsets, the Cartman chip is responsible for performing forwarding and classification decisions on received data packets. (The chips in the accused devices are named after characters in the television show South Park.) The result of the packet processing is an Address Filtering Header, which includes information such as the transmit modification index.

In the Broadcom chipsets, the fowarding decisions are made by the ingress device. Information based on the initial forwarding decision is encoded in the HiGig header that is used on these HiGig links. Information generated from processing by the receive Broadcom processor is placed in the "Stack Tag" that is sent with the packet to the transmit Broadcom processor.

OPINION

A. Digest

All of defendant's asserted claims require a "digest." Because defendant has failed to show that a reasonable jury could find that any of the accused devices includes a digest as

23

it is used in the asserted claims, I will grant plaintiff's motion for summary judgment with respect to defendant's claim for infringement of the '181 patent.

Defendant says that the term "digest" should be given its "plain and ordinary meaning," which it says is "a summation, condensation or collection of information." Dkt. #159, at 11. Defendant then argues that the *contents* of the headers in the accused devices meet this definition. Unfortunately for defendant, this argument is flatly inconsistent with the claim language, which makes it clear that the digest is a structure and not the contents of the structure. In claims 1, 6 and 7 the digest is described as "*containing* network protocol processing information" or "*containing* network communication protocol information." Thus, the digest cannot be the contents themselves; it must be what holds the contents.

The difficulty of defendant's position is demonstrated by its view that the contents of the headers also satisfy the "network protocol processing information" limitation. To accept defendant's argument, I would have to conclude that the "digest" and the "network protocol processing information" are one and the same thing, making the digest limitation superfluous. This would be contrary to law. Bicon, Inc. v. Straumann Co., 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim").

Because defendant concedes that the digest limitation is not met by the headers themselves, e.g., dkt. #159, at 12 ("Neither Enterasys or its expert contends that the AFH

24

[header] is the digest of the '181 claims."), it cannot prevail on its claims for infringement under the '181 patent.

———

## II.  DEFENDANT'S U.S. PATENT NO. 5,430,727

Invention:       Combining a router and a bridge in a single device that acts as a bridge in certain circumstances to prevent messages from being discarded

Asserted Claims:       5, 6 and 7[2]

Accused Devices:       Black Diamond 6808, 8806, 8810, 10808, 12802R,12804R and 12804C; Summit 48si, 200-24, 200-48, 300-24, 400, X250e, X450a, X450e.

### UNDISPUTED FACTS

#### A.  The Claims in Issue

Defendant owns the rights to U.S. Patent No. 5,430,727, which is entitled "Multiple Protocol Routing."

Claim 5 discloses:

A device which is capable of acting as a router to forward to and from end systems

———

[2] Defendant withdrew its allegations of infringement of claim 1 in its response brief. Dkt. #159, at 1 n.1.

user data packets and is capable of acting as a bridge to forward between networks user data packets, said device comprising

router circuitry causing said device to act as a router recognizing and forwarding user data packets conforming to a first protocol suite,

bridge circuitry causing said device to act as a bridge recognizing and forwarding user data packets conforming to at least a second protocol suite,

control circuitry causing said device to act as a bridge rather than as a router for a user data packet which conforms to said first protocol suite and is addressed to a single address which is not an address of the device.

Claim 6 discloses:

The device of claim 5 wherein said first protocol suite comprises a TCP/IP protocol suite.

Claim 7 discloses:

The device of claim 6 wherein said router circuitry causes said device to act as an IP router when forwarding IP packets.

A "protocol suite" is "a comprehensive set of protocols that is designed to work together to coherently provide complete communication capabilities." The patent provides the examples of TCP/IP packets as one type of protocol suite and OSI packets as another kind of protocol suite.

## B. Plaintiff's Accused Devices

The Cartman chip identifies information from the data packet, including the

EtherType.  Ascertaining the EtherType field is equivalent to ascertaining the protocol suite of the packet.

The accused devices review and rely on the destination MAC address from the data packet's data link layer header to determine whether to bridge the packet.  If the MAC address of the data packet does not match the MAC address of the device, the device will bridge the packet.  The identification of the protocol suite plays no role in the determination whether to bridge the packet.


OPINION

Each of the asserted claims includes the limitation "a device . . . which is capable of acting as a bridge . . . said device comprising . . . bridge circuitry causing said device to act as a bridge recognizing and forwarding user data packets conforming to at least a second protocol suite."  The parties devote a significant amount of argument to the issue whether the invention and the accused devices "recognize" the type of protocol suite to which the data packet belongs, but it is clear that each of them do.

Despite aggressive efforts by defendant to twist the meaning of the claim, there is no escaping the claim language: the invention must "recogniz[e] . . . user data packets conforming to at least a second protocol suite."  Defendant suggests that the claim simply means that the invention must recognize the data packet, dkt., #159, at 29, but this is

nonsense.  "[C]onforming to at least a second protocol suite" modifies "data packets"; no reasonable reading of the claim supports defendant's attempt to excise the reference to protocol suites.  Similarly, although plaintiff argues in its brief that its products do not "recognize"a data packet's protocol suite, it concedes in its responses to defendant's proposed findings of fact that at least some of its products "ascertain" the protocol suite of a data packet.  Plaintiff does not suggest that there is any difference between "recognizing" and "ascertaining" in this context.

The real legal dispute is whether the invention and accused devices "act as a bridge" *because* the device "recognizes" a particular protocol suite.  I agree with plaintiff that the invention does and the accused devices do not.

Although the claim does not explicitly state that the protocol suite triggers the decision whether the device acts as a bridge," there is no other reasonable way to interpret the claim.  Claim 5 discloses a device that "act[s] as a router" in some circumstances and "act[s] as a bridge" in other circumstances.  As I noted in the November 21 order, this is not a decision that can be made in a random manner; *something* has to trigger that decision or the invention would be worthless.  Because the device is "acting as a bridge" only when the device "recogniz[es]" data packets that "confor[m]" to a "second protocol suite," it follows that it is the recognition of the protocol suite that triggers the decision to act as a bridge. The claim does not suggest any other triggering event.

28

Further, this interpretation is the only one that is consistent with the specification. In the short discussion of the invention, the patent consistently describes the invention as acting as a bridge depending on whether the packet conforms to the "IP" protocol suite. E.g., '727 pat., col. 51, lns. 27-28 ("For packets which are not IP packets, act as a bridge.") Defendant relies on the all-too-familiar canon that inventions are not necessarily limited to their embodiments, but there is no indication that the specification is discussing only an embodiment rather than the invention as a whole.  Although there is a later section in the specification called "Other Embodiments," it states only that the invention "may be practiced with protocol suites other than OSI and TCP/IP," '727 pat., col. 51, lns. 38-39. This only confirms the view required by the claim language itself that the decision to act as a bridge is controlled by the protocol suite.

With respect to the accused devices, the facts show that the protocol suite does not play any role in the determination to act as a bridge; the decision is made solely on the basis of the MAC address.  Because the asserted claims in the '181 patent require the device to act as a bridge depending on the protocol suite and the accused devices do not include this limitation, defendant's counterclaim for infringement must fail.

Defendant does not advance any arguments under the doctrine of equivalents.  In a footnote in one of its briefs, it says that it "reserves the right to have its expert provide . . . opinions that the Extreme products infringe under the doctrine of equivalents."  Dkt. #159,

29

Case: 3:07-cv-00229-bbc   Document #: 237   Filed: 05/05/08   Page 30 of 33

at 2 n.3.  Nice try.  As has been stated many times by this court and others, summary judgment is not a dress rehearsal for the main event.  E.g., Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005).  It is a party's last chance to show that it is entitled to a trial on its claims.  Parties may not avoid summary judgment by telling the court, "I'm sorry, I don't have any evidence to support my claim now, but I might have some later."  By failing to advance an argument under the doctrine of equivalents in response to plaintiff's motion for summary judgment, defendant has forfeited its right to do so.

## III. VALIDITY

Both parties have moved for summary judgment on the many claims for invalidity that plaintiff has asserted with respect to both the '181 patent and the '727 patent.  Neither party suggests that there is any likelihood that defendant will later sue plaintiff for infringement of any of the asserted claims or, in the language of the Supreme Court, that there is '"a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  MedImmune Inc. v. Genentech, Inc., 127 S. Ct. 764, 771 (2007) (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941)).

As I noted in Silicon Graphics, Inc. v. ATI Technologies, Inc., 06-cv-611-bbc (W.D. Wis. Mar. 25, 2008), there is ample room for argument on the question whether a district

court retains jurisdiction to decide claims for invalidity once all of the claims for infringement are dismissed.  Compare Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1348 (Fed. Cir. 2005) (holding that district court erred in determining that jury verdict of non-infringement divested district court of jurisdiction to hear unenforceability counterclaim) with Benitec Australia, Ltd. v. Nucleonics, Inc., 495 F.3d 1340, 1347 (Fed. Cir. 2007) (holding that district court correctly determined that it had been divested of jurisdiction to hear defendant's counterclaims for invalidity and unenforceability when plaintiff had voluntarily dismissed its infringement claims without prejudice before trial). However,  I concluded in Silicon Graphics that even if a court retains jurisdiction to decide issues of validity that are not tied to an actual controversy, it has discretion to dismiss those claims *before* trial, which is one way to reconcile the approaches of Fort James and Benitec. See also Cardinal Chemical Co. v. Morton International, Inc., 508 U.S. 83, 95 (1993) (in addressing motion for declaratory judgment district court has discretion in determining whether to exercise jurisdiction even when established).    Further, in this case noninfringement is much clearer than invalidity, a factor the court of appeals has held is important in determining whether discretionary dismissal is appropriate.   Phonometrics, Inc. v. Northern Telecom Inc., 133 F.3d 1459, 1468 (Fed. Cir. 1998).   Accordingly, plaintiff's claims relating to invalidity of the '181 and '727 patents will be dismissed without prejudice.

31

ORDER

IT IS ORDERED that

1.  Plaintiff Extreme Networks, Inc.'s motion for summary judgment, dkt. #124, is GRANTED with respect to defendant Enterasys Networks, Inc.'s counterclaims for infringement of the U.S. Patents Nos. 5,195,181 and 5,430,727. Defendant's counterclaims for infringement are DISMISSED with prejudice.

2.  Plaintiff's motion for summary judgment, dkt. #124, is DENIED with respect to its claims that the '181 patent and the '727 patent are invalid.  Plaintiff's complaint is DISMISSED without prejudice as to those claims.

3.  Plaintiff's motion for summary judgment, dkt. #124, is DENIED with respect to its claims for infringement of U.S. Patents Nos. 6,678,248, 6,859,438 and 6,104,700.

4.  Defendant's motion for summary judgment, dkt. #121, is GRANTED with respect to plaintiff's claim for damages for infringement.  Plaintiff's damages will be limited at trial to those it incurred after it filed this lawsuit on April 20, 2007.  Defendant's motion is DENIED in all other respects.

5.  Plaintiff's motion to strike the supplemental expert report of Kevin Jeffay, dkt. #105, and its motion for leave to file a reply to that motion, dkt. #152, are DENIED as

32

unnecessary.

Entered this 5th day of May, 2008.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

33